IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DR. LARRY WISE,                            *

    Plaintiff,                            *

        v.                                *          Civ. No. JKB-22-3292

UNIVERSITY OF MARYLAND                     *
MEDICAL SYSTEM CORPORATION,
                                           *
    Defendant.

  *     *     *     *     *     *     *     *     *     *     *     *

## MEMORANDUM

Pending before the Court are cross motions for summary judgment filed by Defendant University of Maryland Medical System Corporation ("UMMS") (ECF No. 43) and Plaintiff Dr. Larry Wise (ECF No. 45). For the reasons that follow, Defendant's Motion will be granted, Plaintiff's Motion will be denied, and this case will be closed.

### I.    *Factual and Procedural Background*

Plaintiff filed a Complaint alleging discriminatory failure to hire based on race in violation of Title VII of the Civil Rights Act of 1964. (*See generally* Compl., ECF No. 2.) In short, Plaintiff was offered the position of staff psychiatrist at University of Maryland Shore Regional Health ("UM Shore Regional"). The offer was contingent on, among other things, receiving privileges to practice at the hospital. He did not receive such privileges, and the offer was rescinded. The parties agree about these facts. They disagree, however, on the reason for the rescission. As discussed in more detail below, Defendant explains that the offer was rescinded when Plaintiff's past employment could not be verified and when it learned that Plaintiff had failed the board exam 18 times. Plaintiff explains that Defendant did not follow its internal procedures for credentialing

him and that the offer was rescinded due to his race.

### A. UMMS, UM Shore Regional, and Shore Medical Group

UM Shore Regional is a wholly owned subsidiary of Defendant UMMS and has its own board of directors and bylaws. (Huffner[1] Aff. ¶ 3, ECF No. 43-9.) Physicians that practice at UM Shore Regional are employed by UMMS's subsidiary, Shore Medical Group. (*Id.* ¶ 4.)

### B. Credentialing Process

Physicians who practice at UM Shore Regional must have clinical privileges, and the process of obtaining privileges—called "credentialing"—requires UM Shore Regional to verify a physician's clinical expertise, training, and professional experience. (Huffner Aff. ¶ 5.) Maryland law requires hospitals to have such a process. *See* Md. Code Ann. Health–Gen. § 19-319(e) (providing that "establish[ing] a credentialing process for the physicians who are employed by or who have staff privileges at the hospital" is a "condition of licensure" for a hospital); Md. Code Regs. 10.07.01.24 (providing that hospitals "shall have in effect a credentialing process" and requiring hospitals to "collect, verify, review, and document" aspects of a physician's background, including education, clinical expertise, and training). The Medical Staff Office ("MSO") of UM Shore Regional administers the credentialing process. (Huffner Aff. ¶ 6.)

To be credentialed, applicants start by submitting an electronic application. The UM Shore Regional Medical Staff Bylaws ("Bylaws") provide that an applicant must "[d]emonstrate his/her background, experience, training, current competence, knowledge, judgment, and ability to perform all privileges requested." (Bylaws ¶ 2.3.1, ECF No. 49-2.) Applications must include "at a minimum . . . [c]opies of all requested documents and information necessary to confirm the applicant meets criteria for . . . privileges and to establish current competency . . . ." (*Id.* ¶ 3.1.1.)

---

[1] Dr. William Huffner is the Chief Medical Officer of UM Shore Regional.

The Bylaws provide that "[t]he burden is on the applicant to provide all required information" and that "[i]t is the applicant's responsibility to ensure that the medical staff office receives all required supporting documents verifying information on the application and to provide sufficient evidence . . . that the applicant meets the requirements for medical staff membership and/or the privileges requested." (*Id.* ¶ 3.1.2.) An applicant also "ha[s] the burden of producing information deemed adequate by the hospital for a proper evaluation of current competence, character, ethics, and other qualifications, and of resolving any doubts." (*Id.* ¶ 3.1.4.) Once the applicant's information is received, the MSO contacts prior employers. (Huffner Aff. ¶ 7.)

Applications that are deemed incomplete—meaning that they are missing information or that "new, additional, or clarifying information" is required—are not processed. (Bylaws ¶ 3.1.1.) Applications are complete if all necessary data has been verified as accurate. (Huffner Aff. ¶ 8.) Once an application is complete, the MSO presents it to the credentialing committee. (*Id.*) If a complete application is presented to the committee and privileges are denied, the hospital must report that event to the National Practitioners Data Bank. (*Id.*)

### C. *Plaintiff's Interview and Offer*

In the summer of 2019, UM Shore Regional recruited for both a staff psychiatrist and a medical director of behavior health. (Huffner Aff. ¶ 10.) The staff psychiatrist position required that the candidate obtain clinical privileges; to obtain those privileges, the candidate had to either be board certified or board eligible. (*Id.* ¶ 12; *see also* Staff Psychiatrist Job Description, ECF No. 43-11 (explaining that "[b]oard certification in General psychiatry is required" and that the candidate was required to possess "the appropriate clinical privileges").) If a candidate was only board eligible (as opposed to board certified) he or she was required to achieve certification within five years. (Huffner Aff. ¶ 12.)

3

Plaintiff applied for the staff psychiatrist position. (Wise Dep. I at 8, ECF No. 43-3; Huffner Aff. ¶ 14.) Dr. Huffner and Dr. Timothy Shanahan (Medical Director, Shore Medical Group) interviewed him. (*Id.* ¶ 15.) During the interview, Plaintiff informed them that he was not board certified, but that he was scheduled to take the exam in September 2019. (*Id.*)

In August 2019, UM Shore Regional sent Plaintiff an offer letter for the position of staff psychiatrist. (*Id.* ¶ 16.) Per the offer letter, "[e]mployment will be contingent upon meeting any and all employment requirements, including . . . being granted medical staff privileges[.]" (Offer Letter, ECF No. 43-12.) Plaintiff understood that the offer was contingent upon prior employers verifying his competency, on being board eligible, and on receiving hospital privileges. (Wise Dep. I at 18–20.) Dr. Huffner explained that Plaintiff was offered the position with the hope that Plaintiff would pass the board exam. (Huffner Aff. ¶ 16.)

### D. Credentialing and Offer Recission

As discussed above, to accomplish the credentialing process, UM Shore Regional required Plaintiff to apply for clinical privileges to verify his qualifications. UM Shore Regional required him to provide information for each prior employer, including the employer's name, a supervisor, and contact information (including address, phone number, and email address). (*See* Credentialing Application, ECF No. 43-13; Huffner Aff. ¶ 20.)

On August 13, 2019, Plaintiff submitted his application, listing one employer in the application. (Credentialing Application; Huffner Aff. ¶ 17.) With respect to other employers, he did not include them on the application itself, but rather provided his curriculum vitae, which provided some, but not all, of the requested information. (Wise C.V., ECF No. 43-4; Wise Dep. I at 55.) The document did not provide contact information or supervisor information. (Wise C.V.) Further, some of the employers are listed only as "private practice" and the relevant city, without

4

any additional identifying information. (*Id.*)[2]

The above facts are generally undisputed. However, the crux of the Parties' dispute relates to the reason for the offer recission, as discussed in more detail below.

### 1. *Facts Provided by Defendant*

The MSO attempted to verify the information in the application despite Plaintiff's failure to provide all required details. (Huffner Aff. ¶ 21.) The MSO "worked to verify the necessary information by inputting information from the internet, following up with Dr. Wise, and contacting the previous employers for which UM Shore Regional was able to locate contact information." (*Id.*) The MSO did not receive responses from 14 of Plaintiff's prior employers. (*Id.* ¶ 19; *see* Oct. 28, 2019 Email, ECF No. 43-14 (email from Cynthia Yost (MSO) to Plaintiff explaining that 14 work histories still required verification, that they had "requested verification x4 with no response" and that there "is also a concern with [his] board certification").) The MSO contacted the American Board of Psychiatry and Neurology, which declined to verify whether Plaintiff was board certified or board eligible. (Huffner Aff. ¶ 23.) The MSO was not otherwise able to determine if Plaintiff was board eligible. (*Id.* ¶ 24.)

Dr. Huffner became concerned about the MSO's inability to verify Plaintiff's prior employment, and his concerns intensified upon learning that Plaintiff failed the board exam 18 times. (Huffner Aff. ¶ 24–25 (Dr. Huffner explaining that the MSO informed him of the multiple board exam failures in October 2019).)

On November 1, 2019, Dr. Huffner called Plaintiff to alert him that, given the incomplete application and his failure to pass the board exam, UM Shore Regional would likely deny his

---

[2] Defendant raises various other pieces of information that Plaintiff apparently did not disclose in his application that bear upon his qualifications for the position. However, Defendant was not aware of these omissions at the time that Plaintiff's offer was rescinded, so the Court will not consider them in the analysis of Wise's Title VII claim.

credentialing application. (*Id.* ¶ 27.) Dr. Huffner advised Plaintiff to rescind his application to avoid the mandatory reporting to the National Practitioner Data Bank. (*Id.* ¶ 28.)[3] Plaintiff refused, and the MSO therefore continued to attempt to verify his work information and board certification. (Nov. 1, 2019 Email, ECF No. 43-15 (email from Dr. Huffner explaining that "Dr. Wise wishes to continue to pursue privileging at UMSRH. Please follow our process," to which Yost responds that the MSO was "continuing to obtain work verification and board certification").)

In late November 2019, Dr. Huffner emailed Plaintiff to inform him that his application was incomplete due to the 14 outstanding employment verifications and because his board eligibility status could not be verified. (Nov. 25, 2019 Email, ECF No. 43-16.) In that email, Dr. Huffner explained that (1) "[t]here are 14 outstanding employment verifications that are not responding to our request for verification of employment" and that "[w]e have emailed, faxed and called with no results" and (2) that Plaintiff "stated that [he] took the board exam in September 2019, [and] apparently [has] not received any results and the American Board of Psychiatry & Neurology would not confirm this information." (*Id.*)

Shore Medical Group leadership, including Dr. Huffner, decided to rescind Plaintiff's offer and, on December 10, 2019, Dr. Huffner communicated that decision to Plaintiff. (Huffner Aff. ¶ 31.) Dr. Huffner emailed Plaintiff and explained that the application would not move forward, "as it ha[d] been deemed incomplete." (Dec. 10, 2019 Email, ECF No. 43-17.)

### 2. *Facts Provided by Plaintiff*

Plaintiff explains that his application did not move forward because of his race and due to "defamation from [his] previous employer, Four All Seasons (FAS)." (ECF No. 45; *see also* Wise

---

[3] Plaintiff characterizes the November 1, 2019 call differently than Defendant, and explains that Dr. Huffner demanded that he rescind his application. (ECF No. 45.)

Dep. I at 108–12 (explaining that Dr. Huffner deemed Plaintiff's application incomplete based on his race and that "there were no other reasons not to hire me for this position").)

Plaintiff explains that he satisfied all requirements for presentation to the credentialing committee on or around October 23, 2019. (ECF No. 45 (stating that he "was able to be presented for hospital privileging committee on 10/4/2019").) He explains that his "peer references" were complete by September 6, 2019, that verification of his hospital experience was completed on October 5, 2019, and that he is board eligible. (ECF No. 45.) He provides an email in which Dr. Shanahan reports that two of Plaintiff's three references "had nothing but positive things to share." (Oct. 4, 2019 Email, ECF No. 49-4 at 4.)

Plaintiff argues that Defendant did not actually attempt to verify his employment. (ECF No. 45.) He explains that the only employer that was contacted was FAS. (*Id.*; *see also* ECF No. 49 at 3; ECF No. 50-6.) Plaintiff further explains that "[e]fforts by the Plaintiff to assist in contacting the thirteen missing/requested previous employers were rejected on" December 10, 2019. (ECF No. 45.) Plaintiff provides emails, which he explains support his contention that "[n]o contact with any other previous employer was made." (ECF No. 50.) Those emails reflect that Plaintiff emailed certain entities, which presumably are Plaintiff's former employers, to ask whether UM Shore Regional attempted to verify his prior employment. (ECF No. 50-6.) It appears that he did not receive responses from several of the entities, or that the emails could not be delivered. One entity responded that "[w]e do not have any information in your personnel file to verify that we received anything from UM Shore Regional Health in the HR department." (ECF No. 50-6 at 17.) Another entity responded "[w]e have no record of any employment verifications on the date you provided." (*Id.* at 22.) Another entity responded "I see an entry for March 11, 2020 for Dorchester County. I believe that is the date we could not come to work. The verification

7

was not completed or sent to anything." (*Id.* at 25.)

· He also explains that the hospital did not follow its own procedures. For instance, he explains that "[n]o letter requesting assistance was sent as outlined in section 3.1.2" of the Bylaws. (ECF No. 45; Bylaws § 3.1.2 (providing that, if additional information is required for an application, the MSO will send a letter requesting that information and that, if the information is not provided within 45 days, the application will be deemed to be withdrawn); *see also* Wise Dep. I at 110 (discussing Dr. Huffner's "blatant disregard for the rules of hiring").)

### E. Staff Psychiatrist Position and Job Offer to Dr. Laurence Pezor

#### 1. Facts Provided by Defendant

On October 14, 2019, UM Shore Regional offered Dr. Laurence Pezor a contract to serve as the medical director of behavioral health. (Huffner Aff. ¶ 34, 37.) Dr. Pezor "possessed impressive credentials." (*Id.* ¶ 35.) In addition, Dr. Pezor submitted a complete credentialing application and the MSO was able to verify Dr. Pezor's competency, as all of Dr. Pezor's previous employers verified his employment and the MSO verified his board certification. (*Id.* ¶ 36.) The staff psychiatrist position that Plaintiff was offered remained vacant until September 6, 2022. (*Id.* ¶ 40.) While searching for a candidate to fill that position, UM Shore Regional contracted with a psychiatrist beginning on August 10, 2021. (*Id.*)

#### 2. Facts Provided by Plaintiff

Plaintiff explains that he was offered the medical director position (in addition to the staff psychiatrist position). He points to an email in which Dr. Shanahan asks him to forward three references and states that "[s]ince you are considering the leadership role, at least one reference from that position would be great." (Sept. 17, 2019 Email, ECF No. 49-4 at 2.) In a later email, Dr. Shanahan says, "[i]f you wish to pursue the directorship[,] an updated CV and references

8

particular to administrative experience would be greatly appreciated." (Oct. 4, 2019 Email, ECF No. 49-4 at 4.) The offer letter to Plaintiff explains that he is being offered a position "to join the staff . . . as an employed psychiatrist." (Offer Letter.) Plaintiff also argues that Dr. Pezor is "a less[e]r applicant . . . than the Plaintiff." (ECF No. 45.)

## II.    *Legal Standard*

Federal Rule of Civil Procedure 56 provides that a party can move for summary judgment on a "claim or defense" or "part of [any] claim or defense," provided it shows "that there is no genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden is on the moving party to demonstrate the absence of any genuine dispute of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). If sufficient evidence exists for a reasonable factfinder to render a verdict in favor of the party opposing the motion, then a genuine dispute of material fact is presented, and summary judgment will be denied. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). However, the "mere existence of a scintilla of evidence in support of the [opposing party's] position" is insufficient to defeat a motion for summary judgment. *Id.* at 252. Further, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248.

Rule 56 requires parties to support summary judgment arguments with sufficient citations to the record. Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by [either] . . . citing to particular parts of materials in the record, . . . [or] showing that the materials cited do not establish the absence . . . of a genuine dispute[.]"). "Failure to cite admissible evidence is especially perilous where . . . the non-moving party is the plaintiff, who bears the ultimate burden of persuasion." *Jones v. United Health Grp., Inc.*, Civ. No. JKB-

9

17-3500, 2019 WL 1903668, at *6 (D. Md. Apr. 29, 2019), aff'd sub nom. *Jones v. UnitedHealth Grp., Inc.*, 802 F. App'x 780 (4th Cir. 2020); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986) (if the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case" for which it "will bear the burden of proof at trial," "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial").

## III.    *Analysis*

For the reasons below, the Court finds that there is no genuine dispute of material fact, and will grant summary judgment in favor of Defendant.

### A. *New Claims*

As an initial matter, Defendant explains that Plaintiff appears to assert additional claims—grounded in defamation, retaliation, and state unlawful employment practices—and argues that he may not do so. (ECF No. 46.) Plaintiff explains that "[t]here are no new claims or amendments" and that he "seeks judgment on Title VII race discrimination" and that "retaliation and defamation were simply the source and mechanism of race discrimination." (ECF No. 50.)

In any event, Plaintiff is not permitted assert new claims at this stage of the litigation. *See Cloaninger ex rel. Est. of Cloaninger v. McDevitt*, 555 F.3d 324, 336 (4th Cir. 2009) ("[A] plaintiff may not raise new claims after discovery has begun without amending his complaint."). Because "a complaint guides the parties' discovery, putting the defendant on notice of the evidence it needs to adduce in order to defend against the plaintiff's allegations, constructive amendment of the complaint at summary judgment undermines the complaint's purpose and can thus unfairly prejudice the defendant." *Harris v. Reston Hosp. Ctr., LLC*, 523 F. App'x 938, 946 (4th Cir. 2013)

(citation and quotations omitted). In this case, discovery has been completed and Plaintiff never sought to amend his complaint. Defendant would be prejudiced by any effort to constructively amend the complaint by way of summary judgment briefing. Therefore, to the extent Plaintiff intended to set forth additional claims, which does not appear to be the case, the Court will not consider them.

### B. Employer

Defendant is entitled to summary judgment with respect to Plaintiff's Title VII claim for the simple reason that it was not Plaintiff's employer for Title VII purposes. Title VII prohibits discrimination by an employer against an employee. "[W]hen a subsidiary hires employees, there is a strong presumption that the subsidiary, not the parent company, is the employer." *Johnson v. Flowers Indus., Inc.*, 814 F.2d 978, 980 (4th Cir. 1987). Further, "[a] parent company is the employer of a subsidiary's personnel only if it controls the subsidiary's employment decisions or so completely dominates the subsidiary that the two corporations are the same entity." *Id.* "[I]n determining when a parent crosses this line, the courts have found parent corporations to be employers only in extraordinary circumstances." *Id.* (citation and quotations omitted).

The record is devoid of evidence to suggest that this case presents the "extraordinary circumstances" required to overcome the strong presumption that Defendant is not Plaintiff's employer. There is no evidence to suggest that UMMS—as opposed to UM Shore Regional—had anything to do with the interview process, the offer, or the ultimate recission of that offer. Plaintiff "appears to concede this point, as he has failed to respond to the [Defendant's] argument on this point. *See McKeel v. United States*, 178 F. Supp. 2d 493, 504 (D. Md. 2001).

The Court finds that summary judgment should be granted in favor of Defendant because it was not Plaintiff's employer for purposes of Title VII.

### C. *Failure to Hire Claim*

Assuming that Defendant UMMS was Plaintiff's employer, the Defendant would still be entitled to summary judgment on Plaintiff's Title VII claim.

Where—as here—a plaintiff does not provide "direct evidence" of discrimination, he may prove a Title VII claim through the burden shifting framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). *Byers v. Alamance Cnty.,* 633 F. App'x 135, 136 (4th Cir. 2016). As the Fourth Circuit has explained:

> To establish a prima facie case of discriminatory failure to hire, [a plaintiff] must prove that (1) he is a member of a protected class; (2) he applied for the position; (3) he was qualified for the position; and (4) his application was rejected "under circumstances that give rise to an inference of unlawful discrimination." *Anderson v. Westinghouse Savannah River Co.,* 406 F.3d 248, 268 (4th Cir. 2005). If he meets this burden, the burden shifts to the [defendant] to produce evidence of a legitimate, nondiscriminatory reason for declining to hire [the plaintiff]. *See Hoyle v. Freightliner, LLC,* 650 F.3d 321, 336 (4th Cir. 2011). If the [defendant] makes such a showing, the burden then shifts back to [the plaintiff] to prove that the employer's asserted justification is pretextual. *See Jacobs v. N.C. Admin. Office of the Courts,* 780 F.3d 562, 575–76 (4th Cir. 2015).

*Id.* As this Court has previously explained, "[t]he relevance of the prima facie case under *McDonnell Douglas* at the summary judgment stage is limited." *Equal Emp. Opportunity Comm'n v. Manufacturers & Traders Tr. Co.,* 429 F. Supp. 3d 89, 120 (D. Md. 2019). This is because "once the employer asserts a legitimate, non-discriminatory reason, the question whether the employee actually made out a prima facie case is no longer relevant and thus disappears and drops out of the picture." *Id.* at 120–21 (citations and quotations omitted). Where, as here, a defendant advances a non-discriminatory reason for the adverse employment action, "the summary judgment inquiry focuses largely on the third step." *Equal Emp. Opportunity Comm'n v. CACI Secured Transformations, LLC*, Civ. No. JKB-19-2693, 2021 WL 1840807, at *11 (D. Md. May 7, 2021). In short, "once an employer rebuts the prima facie case with a legitimate, nondiscriminatory

reasons for the employment action 'the *McDonnell Douglas* framework—with its presumptions and burdens—disappear[s], and the sole remaining issue is discrimination *vel non*.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 318 (4th Cir. 2005) (quoting *Reeves v. Sanderson Plumbing Prods. Inc.*, 530 U.S. 133, 142–43 (2000)).[4]

The record in this case does not suggest that Plaintiff's offer recission was due to his race, and no reasonable jury could so find. *See Anderson*, 477 U.S. at 252 (explaining that the summary judgment inquiry "unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict").

There is no genuine dispute that the Plaintiff was not qualified for the position he was offered, as those qualifications were outlined in the contingent offer letter. The offer letter explained that Plaintiff's offer of employment was contingent upon "being granted medical staff privileges," among other things. (Offer Letter.) It is undisputed that UM Shore Regional did not verify his employment with respect to 14 employers, that he failed the board exam 18 times, and that he was not granted privileges.

Plaintiff argues that UM Shore Regional did not even attempt to verify much of his employment history and provides emails that purport to reflect this fact. Critically, it is not clear what precisely these emails reflect. As noted above, Plaintiff emailed several entities to ask whether UM Shore Regional attempted to verify his employment. It appears that Plaintiff sent emails to at least 10 entities, and that the emails were undeliverable or that Plaintiff did not receive

---

[4] Defendant easily meets its burden of production under the second step of *McDonnell Douglas*. It has set forth evidence that UM Shore Regional was unable to verify Plaintiff's prior employment, that he failed the board exam 18 times, and that these issues caused UM Shore Regional to doubt his qualifications for the position he was offered and to ultimately rescind the offer. This is sufficient for Defendant to meet the second prong of the *McDonnell Douglas* analysis. *See Kozlowski v. Hampton Sch. Bd.*, 77 F. App'x 133, 140 (4th Cir. 2003) (explaining that a defendant's burden with respect to the second step of *McDonnell Douglas* is "easy to overcome" and that "[t]o overcome the presumption of discrimination, the defendant" need only "present evidence from which a reasonable fact-finder could conclude that the defendant acted based on a legitimate, non-discriminatory reason").

a response from at least six of those entities. (*See* ECF No. 50-6 at 1–3, 8, 11, 14, 37, 38–40.) For the entities from which he received a response, one said "I received this email as well and I have pulled his file if you can tell me what needs to be done." (*Id.* at 4.) Another responded that "[w]e do not have any information in your personnel file to verify that we received anything from UM Shore Regional Health in the HR Department." (*Id.* at 17.) Another responded "[w]e have no record of any employment verifications on the date you provided." (*Id.* at 22.) Another responded "I see an entry for March 11, 2020 for Dorchester County. I believe that is the date we could not come to work. The verification was not completed or sent to anyone." (*Id.* at 25.) These emails reflect that—at most—a handful of former employers did not receive employment verification requests from UM Shore Regional. The emails reflect that the former employers were largely either not reachable or did not respond to Plaintiff, which corresponds with the MSO's purported experience attempting to verify Plaintiff's prior employment. This does not support a conclusion that the Plaintiff was discriminated against, and nothing in the record suggests that any failure to obtain employment verification was due to his race.

Even assuming that Plaintiff is correct that UM Shore Regional did not attempt to verify some of his employment history for some of his prior employers, there no dispute that Plaintiff was required to either be board certified or board eligible to obtain medical privileges. There is likewise no dispute that Plaintiff failed the board exam 18 times, that UM Shore Regional was not aware of this fact when they extended the offer to him, or that UM Shore Regional was unable to determine his board eligibility during the credentialing process. Further, although Plaintiff states that he is board eligible, he does not provide any evidence to support this assertion.[5]

---

[5] Plaintiff explains that he met the qualifications for credentialing in October 2019. However, Plaintiff "cannot establish [his] own criteria for judging [his] qualifications" and must abide by "the qualifications established by h[is] employer." *Anderson*, 406 F.3d at 269; *see also Mungro v. Giant Food, Inc.*, 187 F.Supp.2d 518, 522 (D. Md. 2002) ("What matters is not the employee's self-perception regarding the quality of his job performance, but the perception

Further, that Dr. Pezor, a white doctor, was hired does not salvage Plaintiff's case, as Dr. Pezor was hired for a different position than Plaintiff, and was qualified for that position.

First, Dr. Pezor was hired for a different position: medical director of behavioral health. There is no evidence that Plaintiff was ever offered the medical director position, despite his contention otherwise. Plaintiff only points to emails that reflect that *he* was considering applying for the directorship position, not that UM Shore Regional had offered him the position. (*See* ECF No. 49-4 at 2 (Sept. 17, 2019 email from Dr. Shanahan to Plaintiff in which Dr. Shanahan states: "[s]ince you are considering the leadership role, at least one reference from that position would be great."); ECF No. 49-4 at 4 (Oct. 4, 2019 email from Dr. Shanahan to Plaintiff in which Dr. Shanahan says, "[i]f you wish to pursue the directorship[,] an updated CV and references particular to administrative experience would be greatly appreciated.").) The record simply does not reflect that Dr. Pezor was hired in lieu of the Plaintiff. Rather, the record reflects that Dr. Pezor was hired for a different position, and the position that Plaintiff had been offered remained vacant after the offer to Plaintiff was rescinded.

Further, Plaintiff asserts that Dr. Pezor was a "less[e]r applicant" but provides no evidence of this fact. Defendant, on the other hand, presents evidence that Dr. Pezor was a strong candidate for the directorship position, that he was board certified, that he submitted an appropriate application, and that he was able to obtain privileges. (*See* Huffner Aff. ¶¶ 34–37.)

In addition, the record reflects that Dr. Huffner was the individual who interviewed and hired Dr. Wise, and who also then rescinded the offer. This gives rise to a "strong inference" that the recission was "*not* discriminatory." *Smyth-Riding v. Scis. & Eng'g Servs., LLC*, 699 F. App'x

___

of the decision-maker." (citations and quotations omitted)). There is no evidence that Plaintiff's credentialing application was complete in October 2019 such that he should have been presented to the credentialing committee.

15

146, 157 (4th Cir. 2017) (emphasis in original); *see also Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 959 (4th Cir. 1996) ("[B]ecause Houseman is the same person who hired Evans, there is a powerful inference that the failure to promote her was not motivated by discriminatory animus." (citation and quotations omitted).)

In short, "[c]onclusory allegations of discrimination do not create a genuine dispute of facts sufficient to withstand summary judgment." *Goldberg v. B. Green & Co.*, 836 F.2d 845, 848 (4th Cir. 1988). Here, there is no genuine issue of material fact, an no reasonable juror could conclude that the contingent offer to Plaintiff was rescinded due to his race. Thus, the Defendant is entitled to summary judgment.

## IV.     *Conclusion*

For the foregoing reasons, an Order shall issue denying Plaintiff's Motion for Summary Judgment, granting the Defendant's Motion for Summary Judgment, and closing this case.

DATED this __2 1__ day of December, 2023.

BY THE COURT:

James K. Bredar
Chief Judge

16